Mr. Freitas. Thank you, Your Honor, and may it please the Court. This appeal presents a different issue, but also something that really goes to the heart of what must be done when obviousness issues are considered. The standard everyone knows and everyone agrees, the question is whether the challenger has carried the burden of proving that the claim to invention as a whole would have been obvious to a person having ordinary skill in the art. And the problem here is that Olympus didn't present evidence tailored to the level of ordinary skill. Even if we agree with you that as in kinetic concepts there is a fundamental absence of testimony from an expert with respect to what one of skill in the art would have understood, and that that's a problem, what about the Board's finding that the 717 itself sort of cried out for the use of an algorithm, and that therefore it would have been obvious, unlike in kinetic concepts where the two stood completely independently alone, the Board found that here the patent itself said you could program it, you could use essentially an algorithm. Why wouldn't it make sense for one of skill in the art to look to the other art to find that algorithm? So there's a couple of sets of reasons why, Your Honor. The first one is that that process that you just described, Judge O'Malley, we think it's inconsistent with the rule the court addressed in the Brand case and in Zerko explaining what the role of the Board is. The Board evaluates evidence, it doesn't make it. And without evidence from an expert that it would have been significant to a person having ordinary skill in the art as defined, that those that those factors would have been relevant, we don't think there's a basis. We don't think there's any evidence. You're saying that that the Board or any prior effect for that matter, anybody considering these issues could not put aside all these questions about the expert testimony and look solely at the art itself to look for the teacher? Not when the art rises above the ordinary average layperson standard. In a situation with complex technology as we have here, and everybody agrees that it's above the average layperson standard, the bachelor's degree and several years of industry experience is needed. Right, but you're sort of turning around the issue at Kinetic Concepts. There, the question was whether or not the testimony had been dumbed down enough. In other words, you know, there was it wasn't clear whether someone with a lesser level of skill would have found it obvious. My question is, if you can look at the documents and somebody with even the minimal level of skill might find this obvious, wouldn't that be enough? In the hypothetical you just described, Judge O'Malley, where one could look at the art and understand from that lowest level, then yes, expert testimony wouldn't be required and the process would work. But that's the interesting thing about this case and how it differs from the others. In the other cases, the ones that they've cited, the ones we've cited, the problem had to do with what the proper standard would be. Someone was aiming high, someone was aiming low, and it would make a difference, but in the actual context of the case, sometimes it didn't. The Litton case is an interesting one, because in Litton, it was a summary judgment context, and what the trial judge did is said, I'm going to set the level of skill at the lowest possible level, because I think that is what is most favorable to the non-moving party, the patentee in that case. Now, in a situation like that, when the court adopts that stance and finds the patent obvious, well, it's pretty hard to say that there's going to be a problem with the level of skill. In Your Honor's hypothetical, what you suggested was a situation where one viewing the patent would be able to standard, but those aren't the facts here. We have a finding by the board that the level of ordinary skill in the art is much higher than that, that it requires a bachelor's degree, that it requires some experience. So even though in a given case, it would be possible to simply look at the art and assess it from that stance, that's not possible under the facts of this case. The other view of simply looking at the patent and saying that there's a crying need for something, first of all... Well, look at column 5, beginning at line 14. Doesn't it say, basically, that, doesn't it refer to a programmed or programmable, making it adjusted, so by programming it or making it programmable to automatically increase power delivered by the radio frequency power source, and then later refer to another ability to adjust the means with a program? I mean, doesn't that indicate that you would look somewhere to define what that program would be? It does suggest that there would be a program and that one would look somewhere, but without evidence, we don't know where that would be, and also when we look at what the actual scope of the patent is, it wasn't one that absolutely called for it or that needed it, and yet there isn't evidence to support the idea or even findings to support the idea that one would have to go get it. What they did is they simply referred generically, the board that is, they referred generically to teachings, and the ones they cited certainly don't get the job done. So on the basis that the board can only be affirmed based on the fact findings that it made, those teachings, so-called teachings that they mentioned, they don't get the job done. When you say they don't get the job done, this is what they mentioned, right? The point, the section I just read to you, I'm sorry, the section I just read to you, right? That's all they did is they pointed to how the device operates, the device of the 717, and they then mentioned that it uses a controller to manage power delivery. That doesn't say that the algorithm of the 546, what the combination involved, would be something that one of ordinary skill would adopt, but I submit that this line of reasoning doesn't work because they needed evidence of how this would work for a person having ordinary skill, and they didn't present it. So that's what the problem is. So your expert talked about the fact that there were algorithms known in the art at the time of the 717. Yes, Your Honor. And you're saying that those algorithms were just supposed to assume that therefore they had enough algorithms to look at? Well, Your Honor, in the context of this particular patent, the evidence shows that the 717 was perfectly effective for what it did. It didn't need to be changed. There wasn't any indication of a motivation to change it. There wasn't any indication of a reason why. What we have in effect is just hindsight, because I don't think there was any dispute at all that the 717 was effective. That's certainly what our expert Dr. Tucker said, and I don't think we got it. Effective with some algorithm? Effective as it stands to do what it did. Well, he said that because there were algorithms known in the art at the time. Yes, Your Honor, but the point is not that the algorithm, and the algorithm we're describing here is a specific one they pulled out of the 546. Just any old algorithm doesn't invalidate the patent. Do you want to save the rest of your time for rebuttal? There's just one more point I'd like to make right now, Judge Moore, and that is the arguments, the various arguments that Olympus makes to try to overcome the absence of evidence, they don't work, and in particular their reference to what Dr. Tucker says doesn't. Dr. Tucker didn't say the level of skill doesn't matter. What he said was that no matter the level of skill, he would not find the combination obvious. He did not think a person having skill at any level would find it obvious, so what he said cannot be changed or turned into what I think Olympus tries to change it to, the idea that the level of skill doesn't matter. Obviously it does, and there's a finding by the board, and I'll save the rest of my time. Mr. Fishman? Thank you, Your Honor. So first, taking up the argument of level of skill in the art. Here, just to be clear, there's never been a showing that it matters. In fact, PST's expert admitted it didn't matter. Yeah, PST's expert. And at bottom, PST's obviousness argument below and Dr. Tucker's testimony about obviousness was all based on the content and understanding of the 7-1-7 reference and a belief on their part that because it disclosed forming a vapor layer before avoiding a vapor layer, it in essence taught away from itself, and for that reason he found no one would combine at any level because he had a different reading of the art itself. This whole business about failure to explicitly define the level of skill in the art, it's immaterial. It's immaterial to the board's determination that these claims were obvious. Well, it's not immaterial to the fact that the other side's expert's testimony essentially needs to be thrown out because it never spoke to what one of skill in the art would understand at any given point in time. That's up to the fact finder to determine whether or not there's still relevance and probity to Mr. O'Dell's testimony. I assume you're talking about Mr. O'Dell's testimony because he did not offer an explicit definition of the level of skill in the art, but there is precedent for a court crediting expert testimony even where there is no explicit definition of level of skill in the art where it's not material to the opinions that are being presented. Well, that's usually because the person was talking about a lower level of skill in the art rather than a higher level of skill, talking from the standpoint. Or it could be that the fact finder determines that what they're offering testimony on, for example, the content of the art or what it teaches, isn't impacted by the statement, whether or not somebody has a PhD or merely a bachelor's degree and two years of working experience. Here, the other point we would make is that, you know, Mr. Freitas said everybody agrees that this requires expert testimony. Everybody agrees this is above the level of an or, you know, of a lay person. There's no such agreement or session here. We agree that it's appropriate to define the level of skill as their expert Dr. Tucker did, which is with a bachelor's degree and some working experience. This is not a PhD in molecular biology. It's not a PhD in electrical engineering. This is somebody who's graduated college and has been working for a while. And there's been no showing or reason to think this is different than any of the other cases that are cited in the briefs, where the technology was equally accessible or equally complex, depending on how you want to characterize it. Okay, can you move on to the motivation to combine? Absolutely. So on reason to combine, because, a few things. First of all, the board properly found that every claim at issue on this appeal is disclosed in the priority record. And to be clear, because it's a means plus function claim, every limitation and the function of the increasing means is all disclosed in the 717 reference. The only thing that's not explicitly disclosed is the algorithm by which you would increase power at a predetermined rate from the initial level. Now the 717 discloses both manual operation and automatic or digital controller. If you're going to run it with a digital controller, as your Honor Judge O'Malley pointed out, it screams out for an algorithm. You cannot run it without an algorithm, and that's not a disputed point. So then the question is, is there reason to combine it with a looping algorithm? Because it's a means plus function claim, in order to anticipate or obviate, we need to show that one of ordinary skill in the art would have had reason to combine it with the algorithm set forth in the 527 patent itself, which was a looping algorithm, meaning you check to make sure what the power is, what the impedance is, and then you continue to... But there are lots of different ways, lots of different algorithms you could use to accomplish what is being discussed here in Column 5. There are numerous algorithms in the art, and Dr. Tucker, PST's expert, testified that as long as you had tested to determine the maximum power level that you don't want to get to or exceed, an ordinarily skilled artisan could program an RF generator with an algorithm or program to increase power to predetermine rate. So what testimony do you have that says they would particularly pick this kind of algorithm? Well, first of all, I don't think legally under KSR it's necessary that we show that you'd have to choose algorithm A versus algorithm B if it's one of a number of known solutions in the art to the problem, and one would have a reason to try it. That should be enough. In fact, the suggestion that... But... So two points. First, legally, where they're citing now KSR for a moment, where there's a design need or market pressure to solve a problem and there are a finite number of identified predictable solutions, a person of her technical grasp. There's testimony, these were all within the technical grasp of ordinarily skilled artisans, again, from PST's expert. In that instance, the fact that a combination was obvious to try might show that it's obvious under Section 103. But more than that, to the factual question, why would they go for a looping algorithm? Why would one of skill in the art go for a looping algorithm? The whole point of US 717, the base reference for the combination, is that you identify the level of power, maximum power, so that you can apply a lower rate of power increase. The reason you do that is so that you don't hit a maximum impedance or a maximum power level to form the vapor layer, which is discussed as a problem. So in that context, it makes all the sense in the world that one of skill in the art would select a feedback algorithm. That's all a looping algorithm is, a feedback algorithm where you can monitor impedance or monitor power while you're increasing your rate of power from an initial level at a predetermined rate. That's all that the 527 patent discloses. It doesn't disclose the particular rate, the initial level, any of those details. It just says, hey, you might want to check your power or your impedance to make sure you're not going too high too quickly. So again, as KSR tells us, we're not, you know, we're not to suspend our common sense in considering the art of record and whether or not one of ordinary skill would have had a reason to try these things. Well, one thing, the reason to try idea, I understand. One of the things that bothered me about the board's opinion when I read it is, I wasn't positive for sure, it's not crystal clear, but one of the things that concerned me was that the board may have been treating this like a decision that if two references are both within the analogous arts, namely, same field of endeavor, reasonably pertinent to the same problem they're trying to solve, game over, obvious, misproven. And that's in fact what the patentee argued at one point to the board, and the board acknowledged that in its opinion, the patentee argues, blah, blah, blah, blah, blah. And what it never does is say, well, we're not, we, you know, it never says the patentee is right, analogous arts isn't enough, and then goes on the same motivation to combine. So I guess my question to you is, I would find it very troubling if everything within the analogous arts satisfies the motion to combine test. Would you? Yes, Your Honor. And I think that, I think that what you have to appreciate is in this context, the principal argument below for non-obviousness was the teaching away argument. And the teaching away argument and the reason to combine argument are basically, in this case, mirror images of the same thing, which is, the board goes into. Well, it can't, hold on though. It can't be that if something doesn't teach away, then there's all automatically a motion, a reason to combine it either, right? That's fair enough, but here, where the seven, so the issue was, does the 717 itself suggest the combination? And if you accepted PST's argument below, which is that, no, really, because the 717 discloses forming a vapor layer to determine maximum power. Therefore, it doesn't suggest that you would want to combine it with an algorithm to increase power at a predetermined rate. That was, again, Mr. Freitas' position up here just a moment ago, which is, he says, why would you modify it? Well, the board rejected that line of argument to say you're not modifying it or making it for a different purpose based on the fact that the 717 itself discloses that vapor layer is a problem and that their expert acknowledges the ultimate objective of it is to avoid the formation of the vapor layer. It rejects the teaching away argument. Having done that, then, it is not a long jump. Well, you don't have to even go so far as long jump. I think you're selling your argument even a little bit short, which is, if the 717 suggests you don't want a vapor layer and the 546 articulates an algorithm that would allow you to avoid creation of a vapor layer, isn't that actually affirmative evidence? Well, so what the 546 discloses, to be accurate, is all it is is it's a looping algorithm of increasing power at a predetermined rate from an initial level. It doesn't discuss, doesn't talk about vapor layers. It's the 717 that talks about, you want to do this to avoid a vapor layer, but nobody in any patent, including the 527 patent, tells you what the values are for doing it. You have to test, form the vapor layer, figure it out, and program the algorithm. That's why the only thing that is missing from the 717 is the algorithm for increasing power at a predetermined rate. I have a really dumb question, but like, how many, I understand that PST's experts said people knew about the 546 and would know about that algorithm. That's done. And I also understand that there's testimony that there were a number of known possible algorithms. How big a number? Like, is there anything in the record? Are we talking thousands? Because you understand, in terms of there's a motivation to try, the number of options, the larger the number of options, the more concerning it becomes to me about the motivation. So there's no record of other algorithms. But there is some testimony, isn't it, that there are known algorithms? Yes, so what Dr. Tucker's point was is the algorithms, no big deal dummy, was basically what he was saying. Any ordinarily skilled artisan could write the algorithm if they knew what the values were. Heck, any lay, not layperson, but anybody who'd been working as an engineer could even write it. Yes, there were known algorithms, and he even said yes, technically it was well within the ability of one to combine the 546 algorithm with the 717 patent. But there's not, to answer Your Honor's question, it's not like there's exhibits listing other algorithms. And in fact, our position originally when we filed the petition was it should be anticipated because this should have been known, and the board said no, no, no, we need an explicit disclosure, and that was the 546, and it was an explicit disclosure of a looping algorithm. And that's the only algorithm that we put in the record. Ms. Fishman, I have one question. Is there any question that all of the claims that issue Claim 17 plus the dependent claims standard fall on the question of whether the board correctly combined the 717 and the 546? That's correct. There were no additional arguments raised by PST about the unpatentability of the claim, so it rises and falls on the reason to combine on 717 and 546 of Claim 17. Anything else, Your Honors? No, thank you very much. Okay, thank you. Mr. Freitas, a little bit of rebuttal time. Mr. Freitas, just one question. Do you agree with Ms. Fishman, with her response to my last question? Yes, I do, Your Honor. Okay. With respect to the points that Ms. Fishman made, as she read from KSR, there is no finding that there's only a finite number of algorithms, so no findings at all in the obvious to try zone. So there isn't a basis for upholding what the board did on that theory. There's no common sense finding. That's not where the board went. What is being said is different. The board didn't say anything. The problem we have is like in Black and Decker, where the board said almost nothing. And this court has said that those kind of obviousness determinations are not good enough. But there is still, which Olympus hasn't answered, the fundamental problem. There's no evidence that they presented. They could have very simply had Mr. O'Dell tie his testimony to the level of skill eventually found by the board or to another level. They didn't do that. This case is not like the other cases where there are disputes about what the level of skill is and an assessment can be made as to whether it makes a difference. In this case, it has to make a difference. Well, your expert said it doesn't make a difference. He said that as to his opinion, it doesn't make a difference. He did not say, Your Honor, that the level of skill doesn't matter at all. What he said, he was asked specific questions about what he thought. For example, A1272, would applying a higher level of skill in the art to your analysis have changed your opinion? No, I don't think so. I mean, these don't fit. The 546 doesn't fit with the 717. So the questions were tied very specifically to his opinion and to the idea, more importantly, that it wouldn't have been obvious with a higher level of skill. He did not say that the level doesn't matter at all. And that's how this case is different. There's no evidence. Of course it matters. When there's a complete failure of proof, it always matters. And that's where we are in this case. The other points that were made about what the board might have done or what someone might have done under a different standard, under a different level of ordinary skill, those will not get the job done for Olympus. Because they're not supported by evidence or findings by the board. Thank you. I thank both counsel. The case is taken under submission.